# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BERGSTROM IMPORTS MILWAUKEE, INC., et al.,

        Plaintiff,

v.                                  Case No. 12-C-603

CHRYSLER GROUP LLC,

        Defendant.

---

## DECISION AND ORDER

Plaintiff Bergstrom Corporation and its subsidiary, known as Bergstrom Fiat, brought this action to enjoin Defendant Chrysler Group from opening a new Fiat dealership in Madison through a dealer other than Bergstrom. In addition to injunctive relief, the plaintiffs also seek damages allegedly incurred by Bergstrom Fiat as a result of Chrysler's failure to properly support and supply that dealership. Five separate counts are asserted, including unconscionable and arbitrary conduct in violation of the Wisconsin Motor Vehicle Dealer Law ("Dealer Law"), Wis. Stat. § 218.0116 (2009-10), as well as claims for estoppel, breach of contract and breach of the implied covenant of good faith. Bergstrom also brought a motion for a preliminary injunction, which was quickly followed by Chrysler's motion to dismiss. Because the motion to dismiss addresses the same fundamental issues, I directed the parties to focus on that motion, which is now fully briefed. Following argument on the motion to dismiss, I orally denied Bergstrom's motion for a preliminary injunction based on the absence of a likelihood of success on the merits. For the reasons given herein, I now conclude that the motion to dismiss should be granted.

## I. Background

The Fiat marque has a storied history in automotive circles, but Fiats had not been available in the U.S. market for nearly three decades before Fiat, which had recently purchased Chrysler out of bankruptcy, decided to reintroduce the brand in 2011. Chrysler Group LLC, now controlled by Fiat, undertook to establish a network of American dealers to distribute its cars throughout the country, and in Wisconsin it selected the Bergstrom Group, the largest dealership group in the state, to operate the first Fiat store on the northwest side of Milwaukee.

The dealership relationship arose after negotiations between John Bergstrom, Bergstrom's CEO, and Fiat representatives. According to the complaint, Fiat stated that it was currently considering only a single Milwaukee-based dealership for the Wisconsin market, and Bergstrom tailored his business plan accordingly. He soon learned that Fiat was planning to open a dealership in Kenosha, which Fiat considered part of the Chicago market. This raised concerns for Bergstrom, whose profit and revenue assumptions were based on state-wide exclusivity. According to the complaint, whose facts I must accept as true, Fiat's Nancy Davis gave him and another representative oral assurances that, apart from the Kenosha dealership, Fiat would allow the Bergstrom Corporation to have a first right of refusal for any other Wisconsin dealerships it might consider opening in the future. (Compl., ¶ 22.) Bergstrom agreed to go ahead with opening the dealership on the assumption that his company would essentially have the exclusive right to sell in Wisconsin, apart from Kenosha. Without exclusivity, he did not believe the dealership could be profitable.

On December 1, 2010, Bergstrom signed a Letter of Intent (LOI), again with the assurances from Davis that it would have exclusivity in Wisconsin excepting Kenosha. (Parts of the complaint suggest only that Davis told Bergstrom that Chrysler would "talk" to him before opening a new

2

dealership, however.)  The LOI was signed by Bergstrom on behalf of a legal entity to be formed

for the purpose of opening the Fiat dealership.  A dealership agreement was signed on February 8,

2011 between Chrysler and the newly created entity called Bergstrom Imports of Milwaukee, Inc.,

which the parties refer to herein as Bergstrom Fiat.  By then, wheels had been in motion to revamp

Bergstrom's existing dealership to transform it into a Fiat dealership.  At Chrysler's urging to go

"full steam ahead," Bergstrom expended more than $800,000 in remodeling his Milwaukee facility.

Although the dealership was ready to go in January 2011, Fiat did not ship any vehicles for its

inventory until March.  It also failed, according to the complaint, to support the brand with adequate

marketing.  In all, the reintroduction of the Fiat brand in Wisconsin (and elsewhere) was tepid:

nationally, Chrysler sold only 11,000 vehicles, compared to its forecast of 50,000.  Fiat CEO Sergio

Marchionne conceded in an interview that the Fiat launch had been botched and that Fiat had not

supported its dealers during the rollout.  As a result, Bergstrom alleges its operating losses to be in

excess of one million dollars.

By the end of 2011 Bergstrom had learned that Fiat was planning to open a dealership using

another dealer in Madison, some ninety miles west of Bergstrom's Milwaukee dealership.

Bergstrom was able to secure a meeting with senior Chrysler officials, but in April 2012 Chrysler

confirmed that it was going forward with plans to open a Madison dealership with another dealer.

Bergstrom responded by filing a complaint in state court.  The case was removed to federal court

in June based on diversity of citizenship, and Bergstrom's motion to remand was denied in July.

## II. Analysis

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in

a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atlantic Corp. v.*

3

*Twombly,* 550 U.S. 544, 558 (2007). Under the pleading standard now articulated by the Supreme Court, the complaint must contain allegations that "state a claim to relief that is plausible on its face" or it is subject to dismissal under Rule 12(b)(6). *Id.* at 570. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555. That is, the complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. *Id.* at 557. A claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In reviewing a plaintiff's claim, the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor. However, legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption. *Id.* at 679.

Although it was not initially clear in the complaint, briefing and oral argument have clarified that the Bergstrom Corporation has claims that are separate and distinct from those of the Fiat dealership subsidiary it created. I begin by discussing the claims of Bergstrom Fiat, the new dealership, and then proceed to address those alleged by Bergstrom Corporation, the dealership's parent company.

## A. Bergstrom Fiat's Claims

### 1. Fair Dealership Claims

As noted above, Bergstrom alleges that Chrysler's conduct was "unconscionable" and / or "arbitrary," in violation of Wis. Stat. § 218.0116(1)(f) and § 218.0116(1)(x). Specifically, it claims that it was unconscionable and arbitrary for Chrysler to open a competing dealership in Madison and to inadequately support the Fiat launch.

4

### a. The Madison Dealership

Chrysler argues that the Wisconsin Dealer Law already provides a statutory mechanism for existing dealers to challenge a manufacturer's decision to open another dealership. That scheme governs the establishment by a manufacturer of a motor vehicle dealership "within the relevant market area of an existing enfranchised dealer of the line make of motor vehicle," Wis. Stat. § 218.0116(7), which is ten miles. An existing dealer can file a complaint with the State Division of Hearings and Appeals, which holds a hearing to determine if there is good cause to allow the opening of a new dealership. The Division is to consider the following extensive list of factors in determining good cause:

> 1. The amount of business transacted by existing enfranchised dealers of the line make of motor vehicle when compared with the amount of business available to them[;]
>
> 2. The permanency of the investment necessarily made and the obligations incurred by existing enfranchised dealers in the performance of their franchise agreements[;]
>
> 3. The effect on the retail motor vehicle business in the relevant market area[;]
>
> 4. Whether it is injurious to the public welfare for the proposed dealership or outlet to be established or relocated[;]
>
> 5. Whether the establishment or relocation of the proposed dealership or outlet would increase competition and therefore be in the public interest[;]
>
> 6. Whether the existing enfranchised dealers of the line make of motor vehicle are providing adequate consumer care for the motor vehicles of that line make, including the adequacy of motor vehicle service facilities, equipment, supply of parts and qualified personnel[;]

5

7. Whether the existing enfranchised dealers of the line make of motor vehicle are receiving vehicles and parts in quantities promised by the manufacturer, factory branch or distributor and on which promised quantities existing enfranchised dealers based their investment and scope of operations[;]

8. The effect the denial of the proposed establishment or relocation would have on the license applicant, dealer or outlet operator who is seeking to establish or relocate a dealership or outlet.

§ 218.0116(7)(b).

Chrysler argues that this statutory system clearly establishes a procedure explicitly directed at addressing the problems identified in the complaint. As such, Plaintiff's effort to cite the statutory "unconscionability" or "arbitrary" provisions is simply a facile means of side-stepping the statute's intent to create an exclusive remedy. *See Ray Hutson Chevrolet, Inc. v. Gen. Motors Corp.,* 235 F.3d 348 (7th Cir. 2000) (Wisconsin Dealer Law creates exclusive remedy for dealer who wants to add another manufacturer). Although there is no case law on the subject, it is difficult to see the statutory scheme set forth above as anything *but* an exclusive remedy. The legislature created a very specific procedure and directed the Division of Hearings and Appeals to consider various issues germane to the question, including the impact of a second dealership on the public welfare. Allowing an aggrieved dealer to simply claim "unconscionability" would muddle the process and obviate the need for the very procedure the legislature created.

In any event, Bergstrom Fiat has essentially conceded the issue by not addressing it in its brief. It suggests in a footnote that the exclusivity of the provision would be limited to the statutory claims, but would have no impact on their other common law claims. Regardless, it has abandoned any statutory claim based on Chrysler's opening of a new dealership in Madison.

6

**b. Failure to Support New Fiat Dealership**

Bergstrom Fiat instead focuses on Chrysler's alleged failure to support the new dealership once Bergstrom opened it. It alleges that it was both arbitrary and unconscionable for Chrysler to insist that Bergstrom go "full steam ahead" in getting its facilities ready to sell Fiats in January 2011 while at the same time refusing to ship sufficient inventory or support the product with advertising and service support. Some dealers in other states were allowed to operate out of parking lots or tents, whereas Bergstrom had to invest in a new dealership building branded with the Fiat logo.

Some of these complaints may be dispatched summarily. Bergstrom Fiat agreed to create a new dealership, and it knew that doing so would not be cheap. Surely it cannot fault Chrysler for insisting that Bergstrom sell Fiats in a Fiat dealership rather than in a Hyundai showroom, particularly as that was specifically part of the deal the parties reached. In short, Plaintiffs have not cited any precedent suggesting that the Wisconsin Dealer Law is so broad that it would allow a would-be dealer to sign an agreement to open a dealership and then turn around and sue based on the very provisions it agreed to. Certainly it cannot be considered "unconscionable" or "arbitrary" when a manufacturer and dealer agree on provisions *before* the dealer is even a dealer in the first place. Accordingly, the mere fact that Bergstrom invested in a new dealership when dealers in other states apparently were not required to do so (at least initially) does not rise to the level of conduct that triggers Dealer Law protections.

Bergstrom focuses, however, on the fact that once it opened its dealership Chrysler refused to supply any new inventory for two months. This was part of a weak product rollout that forced Fiat CEO Marchionne to issue a national apology. In fact, industry publication *Automotive News* characterized Chrysler's Fiat launch as the worst blunder of 2011. (Compl., ¶ 31.)

7

Plaintiffs cite *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788 (7th Cir. 1989), a case in which the dealer won a jury verdict after alleging that GM had deliberately held back inventory. But *Bob Willow Motors* was another kind of case entirely. There, the allegation was that GM had an ongoing dispute with its dealer and essentially retaliated against the dealer by withholding cars, which eventually eliminated the dealer's ability to sell GM cars.

> Willow then began to experience product allocation problems. Chevrolet's district manager advised Willow that the zone was adjusting allocations to remove cars from Willow, but refused to give a further explanation. Eventually, the manager stopped giving any allocation figures to Willow. Besides allocation problems, Willow faced long shipping delays and difficulty in placing production orders. Frustrated, Willow finally quit taking new car orders altogether because there was no realistic hope of filling them.

*Id.* at 790.

Here, the complaint's own allegations tell the story of a botched product rollout, a *nationwide* flop in Fiat's first year. The press articles cited by Plaintiffs reveal no intent to act unconscionably—after all, Chrysler would not *deliberately* botch a product rollout—but merely a negligent or ham-handed effort that forced the CEO to issue an apology, telling *Automotive News* in 2012 that he took "full blame" for the "poorly executed plan" and that his company had offered "zero support" to its new Fiat dealers. (Compl., ¶ 32.) The allegations of the complaint complain that "in Wisconsin and nationally" sales were much lower than Chrysler had projected. (Compl., ¶ 30.) Although at this stage of the proceedings a complaint must be read with inferences drawn in the Plaintiffs' favor, there is no reasonable reading of the complaint from which one could infer that Chrysler acted with some sort of intentional or reckless disregard of the Bergstrom dealership in particular. Instead, the picture that emerges is one of a universal failure to support the new Fiat launch throughout the country. It could be called "business negligence," perhaps, but Chrysler's

8

actions were not directed at intentionally harming Bergstrom Fiat, in stark contrast to *Bob Willow Motors*.

Plaintiffs argue that the standard for arbitrary or unconscionable conduct is much lower and that conduct need not be intentional for it to violate the Dealer Law. It seems clear that any dictionary definition of unconscionability or arbitrariness would include *some* element of *mens rea*, however. Clearly bad luck or extraneous acts—such as a global recession, or a terrorist attack—would not trigger the Dealer Law's protections, because no one would deem it arbitrary or unconscionable if a manufacturer acted in a given way due to factors outside its control. On the other end of the spectrum are cases like *Bob Willow Motors*, in which the manufacturer seemed to have acted in a deliberate effort to harm the dealer's business. The question, therefore, is what level of intent does it take to constitute arbitrary or unconscionable conduct?

Although cases on this point are scarce, I am satisfied that the language used by the legislature is narrow enough to require something more than mere "business negligence" by the manufacturer, which is all that is alleged here. Even the Plaintiffs' own preferred definition, from a jury instruction used in *Bob Willow Motors,* would define unconscionable conduct as conduct "so unfair or outrageous or unreasonable that equity demands that the wrong be remedied." 872 F.3d at 794. And any notion of arbitrariness requires something more than mere negligence, too—there has to be a *decision* that is based not on reason or circumstance but on whim, malice, spite, or some sort of absence of any reason. I am convinced that there is nothing alleged in the complaint that cries out for equitable relief or is even suggestive of outrageous or unreasonable conduct. If Chrysler fumbled the ball, it was not because it was acting unconsciously or arbitrarily but because it made errors of business judgment.

9

We must remember that businesses, and particularly new business ventures such as car dealerships selling new lines, are inherently risky undertakings. They are fraught with uncertainty not just in the consumer marketplace but on the manufacturing side as well. Even paragons of modern industry like Apple have troubles with new products when they release them, and these problems can include not just design and functionality but supply as well. To allow a Dealer Law claim based solely on a generally poor product rollout that affected dealers nationwide would give Wisconsin dealers something of a guarantee against these inherent business risks, and that is a matter better left to contract (as discussed below) rather than the vague and value-laden terms used by the statute. Moreover, accepting the Plaintiffs' broad view would mean that the Dealer Law could be used to challenge the business judgment of manufacturers, which would subject countless of their decisions to the 20-20 scrutiny of non-expert courts. If the legislature had intended the courts to police the marketplace so searchingly, it would have used terms more expansive than "unconscionable" or "arbitrary" to describe the conduct that is prohibited by the Dealer Law. In short, if a manufacturer promises to provide twenty cars per month and fails to do so, that is a breach of contract. To claim it is "unconscionable" or "arbitrary" for a manufacturer to fail to do so under the circumstances alleged here is another matter altogether. For these reasons, I conclude that the complaint fails to state a claim under the Wisconsin Dealer Law.

### c. Breach of Contract

Bergstrom Fiat's breach of contract claim alleges that Chrysler's failure to provide vehicles during the first months of the dealership was a violation of the dealer agreement. It also alleges that the failure to market Fiats and the discriminatory treatment of the Bergstrom dealership violate the agreement as well.

10

Section 12(A) of the dealership agreement allows Bergstrom Fiat to purchase Fiats.[1]  Section 12(B) requires Chrysler to use commercially reasonable efforts to supply such vehicles "in such quantities and types as may be required to satisfy Dealer's obligations under this Agreement, subject to available supply."  (ECF No. 22-6 at ¶ 12.)  Among other things, the "obligations" described in the agreement include the obligation to maintain a service department, promote Fiats through advertising, maintain minimum inventories, and sell a given number of vehicles, or what the agreement calls the Minimum Sales Responsibility.  Importantly, these are obligations *to Chrysler*. Reading the contract as a whole, § 12(B) provides that Chrysler will supply Fiats to Bergstrom (subject to availability and commercially reasonable efforts) in order to aid Bergstrom in satisfying its minimum inventory and Minimum Sales Responsibility, which is defined in § 18(A).

The problem with Bergstrom's contract claim is that it does not allege it was unable to fulfill any of its obligations to Chrysler under the agreement; instead, the claim is that it could not sell as many vehicles to *customers* as it wanted to.  Section 12(B) is not a guarantee that Chrysler will provide vehicles to Bergstrom so that Bergstrom can make a certain amount of revenues or profits by selling them to customers.  Instead, the clause merely expresses the mutual obligation that Bergstrom must maintain a certain inventory and sell a given number of cars and Chrysler will help it do so by providing vehicles.  The fact that Bergstrom did not get the cars it wanted right away does not violate this clause because no one has alleged that Bergstrom failed to meet any of its "obligations" under the agreement.  That is, the clause might provide a *defense* to Bergstrom if Chrysler had sued Bergstrom for failing to maintain requisite inventory or sell enough cars.

---

[1] The materials cited herein are referenced in the complaint and are thus fair game in the context of this motion to dismiss.

11

(Bergstrom would allege that Chrysler's failure to supply available cars prevented it from complying with the Minimum Sales Responsibility.) But because the clause is linked to Bergstrom's ability to fulfill its obligations to Chrysler under the agreement, the clause does not create some kind of independent or offensive right to require Chrysler to provide any given number of vehicles just so that Bergstrom can make money. The dealer making money is not an "obligation" under the dealership agreement.

Tellingly, the complaint does not allege that Bergstrom was unable to satisfy any "obligations under this Agreement"—it asserts instead that Bergstrom was unable to operate profitably or achieve the sales figures Chrysler projected. (Compl., ¶ 62.) As noted above, nothing in the clause or the agreement as a whole grants Bergstrom Fiat a right to make a certain amount of sales to customers or to demand vehicles from Chrysler. The agreement itself contains a certification signed by Bergstrom indicating that no representations had been made apart from those contained within the agreement itself. (ECF No. 22- 6 at ¶ 11.) Accordingly, because § 12(B) is not triggered merely because the dealer does not have the cars it wants, the contract claim fails to the extent it is based on the alleged lack of inventory during the first months of the dealership.

Bergstrom Fiat also alleges that Chrysler's failure to provide marketing support violated the agreement. But there is no clause in the dealership agreement requiring advertising or marketing support; in fact, the agreement provides that it is the *dealer's* obligation: "Customer satisfaction and the successful promotion, display, sale and lease of FIAT Vehicles and FIAT Products are dependent on, among other things, Dealer's advertising and sales promotion efforts. Accordingly, Dealer shall energetically, actively and effectively promote, display, sell and lease FIAT Vehicles . . ." (*Id.* at ¶ 13(B).) In addition, "Dealer shall engage in advertising, sales and leasing promotion

12

programs, and use effective showroom displays, to perform its obligations under this Agreement to promote FIAT Vehicles and FIAT Products energetically, actively and effectively." (*Id.* at ¶ 13(B)(3).)

Bergstrom argues that there is an implicit requirement that manufacturers support new dealerships with advertising because doing so is tremendously important to the success of a dealership. But once again the contract's silence, combined with the integration clause, mean that Bergstrom cannot rely upon vague "norms" and subjective expectations to support a contract claim. If manufacturer advertising were so crucial to the new dealership, one would expect that it would be included in the agreement itself. Accordingly, any contract claim based on advertising is dismissed as well.

Finally, Bergstrom alleges that Chrysler's discriminatory treatment of the Bergstrom dealership violated the dealer agreement. It admits that the agreement is silent on how Chrysler would treat other dealers but suggests that it was "implicit" in the agreement that the standards Chrysler was imposing on Fiat were being imposed on other dealers uniformly. First, it is hard to imagine how this "discrimination" (the claim that dealers in other states did not have to invest in new dealerships at the outset) caused any financial damage to Bergstrom Fiat. It suggests that it was at some sort of competitive disadvantage, but these alleged dealers were in other states, and it is thus wholly speculative that a dealership on the northwest side of Milwaukee somehow lost business to a Chicago dealer due to "discrimination" at the hands of the manufacturer. That aside, Bergstrom's own subjective understanding of what was "implicit" in an agreement cannot form the basis of a breach of contract claim even if it could somehow show that it was damaged, say, by the fact that a Fiat dealer in Chicago may have initially opened in a tent.

13

**d. Breach of Good Faith and Fair Dealing**

Bergstrom Fiat also alleges that the conduct described above violates the implicit duty of good faith and fair dealing that are attendant in any transaction. For the reasons given above, even if Chrysler's conduct could be described as business negligence, there is no suggestion in the complaint that it was treating Bergstrom unfairly or dealing in bad faith. Accordingly, this claim will be dismissed as well.

**B. Bergstrom Corporation's Contract and Promissory Estoppel Claims**

Bergstrom Corporation brings claims based on the alleged oral promise that it would have a right of first refusal over any future Fiat dealerships in Wisconsin. The claim is brought by the parent corporation, rather than the Fiat dealership, because both the LOI and the dealership agreement between Chrysler and Bergstrom Fiat (and Bergstrom himself) contain clauses significantly limiting their scope. For example, the LOI, which was signed by John Bergstrom on his own behalf as well on behalf of the soon-to-be-created Bergstrom Fiat dealership, states that he acknowledged he had not received any promises regarding any potential sales or additional vehicle lines. (ECF No. 22-6 at ¶ 12.) It further contained an integration clause stating that the LOI constituted the entire agreement of the parties and superceded any previous negotiations or agreements. (*Id.* at ¶ 18.) In addition, the dealership agreement between Bergstrom Fiat and Chrysler indicated very clearly that the dealership would be a non-exclusive "sales locality" and that the dealer "shall not have an exclusive right of any kind to the sales locality." (Dkt. # 22, Ex. 7 at ¶ 7.) The agreement also states that Chrysler maintained the right to appoint other dealers throughout the state.

14

Because these agreements clearly bar any kind of claim based on oral promises of exclusivity on behalf of Bergstrom Fiat, the signatory to the agreements, Plaintiffs now argue that such claims belong to Bergstrom *Corporation,* the parent company, rather than John Bergstrom or the Bergstrom Fiat dealership. Basic principles of corporate law dictate that a parent corporation is not bound by the contracts of its subsidiary merely because it happens to be that subsidiary's owner. As such, Bergstrom argues that the clauses in the LOI and the dealership agreement cannot bar Bergstrom Corporation's contract and estoppel claims.

### 1. Which "hat" was John Bergstrom Wearing when he Allegedly Received Assurances of Exclusivity?

There is no reason to question the Plaintiffs' argument that Bergstrom Fiat and Bergstrom Corporation are two separate entities, a point from which it follows that one entity is not necessarily bound by the agreement of the other. But the notion that Chrysler's oral promises were made to Bergstrom *Corporation* rather than to the dealership requires Bergstrom to argue, somewhat awkwardly, that when Nancy Davis made promises about exclusivity to John Bergstrom or other representatives, she was speaking to them as representatives of Bergstrom Corporation rather than Bergstrom Fiat. At least one objection to Plaintiffs' argument can be founded in common sense. Although it may indeed be true that Bergstrom Fiat is a separate entity from Bergstrom Corporation, there is no explanation in the complaint for how Chrysler was supposed to know it was talking to John Bergstrom in his capacity as CEO of Bergstrom Corporation rather than as the representative of the new Fiat dealership. After all, when John Bergstrom signed the letter of intent to open a dealership, it was not in his capacity as Bergstrom Corporation CEO but as an individual who promised to create a company to operate a Fiat dealership. The LOI, which is addressed to "John Bergstrom" rather than Bergstrom Corporation, begins:

15

> John Bergstrom has requested that Chrysler Group LLC ("CG") enter into a Fiat Dealer Agreement (the "Agreement") with a legal entity to be formed by You [John Bergstrom] solely for the purposes of implementing this LOI . . . For the purposes of this Fiat Brand Letter of Intent ("LOI"), 'You' and 'Your' shall mean, John Bergstrom and/or Legal Entity, as appropriate.

(ECF No. 22-1.)

The LOI is signed by John Bergstrom twice: once, as "dealer principal," and also individually. (*Id.* at 5.) He did not sign the document as CEO of Bergstrom Corporation. The documents thus suggest that during these negotiations, there was never any indication that he was seeking or receiving oral assurances from Chrysler in his role as Bergstrom Corporation's CEO—instead, the only "hat" Bergstrom was wearing was that of the prospective new dealership owner. Under these circumstances, Chrysler was certainly entitled to believe that when it was negotiating with John Bergstrom, it was talking to the principal of the prospective new dealership, not to someone who would have *personal* or other *corporate* rights wholly irrespective of the contractual rights laid down in the contract his company agreed to. Any promises Chrysler might have made during the course of negotiations were promises to the new dealer, not to the parent company. As such, when John Bergstrom signed the dealership agreement as the dealership's new owner, he acknowledged that any oral promises that had been made to him were now washed away. One cannot expect to negotiate on behalf of Company A, sign an agreement, and then claim that promises made during those negotiations somehow redound to the benefit of Company B.

Plaintiffs believe firmly in the separation between Bergstrom Corporation and Bergstrom Fiat, but that separation works both ways. If it is true (and it is) that Bergstrom Fiat is a separate legal entity from Bergstrom Corporation, it must also be true that parties to contract negotiations are negotiating on behalf of separate legal entities as well. Negotiations are conducted by human

16

beings, not by corporations. During these negotiations, John Bergstrom was representing Bergstrom Fiat, the entity he promised to create to run the Fiat dealership. To turn around after the negotiations are finished and argue that some sort of *individual* side promises were made to him would undercut the expectations of the parties. Thus, I agree with Plaintiffs that Bergstrom Corporation cannot be "bound" to its subsidiary's contract, which it did not sign. But the corollary is that the promises the parent corporation alleges it relied upon were never made to the parent in the first place. If any promises were made, they were made to John Bergstrom in connection with his representation of Bergstrom Fiat, not to any parent corporation. Thus, just as Bergstrom Corporation cannot be bound to the contract signed by its subsidiary, it likewise does not have any independent right to enforce oral promises that were made to its subsidiary company.

It might be argued that we are only at the pleading stage, and the complaint does allege, although without explanation, that Nancy Davis did make promises to Bergstrom Corporation, not just to Bergstrom Fiat. But *Twombly* and *Iqbal, supra,* make clear that complaints need not be read to accommodate any possible inference a Plaintiff might hint at. Instead, the complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. *Twombly,* 550 U.S. at 557. There is nothing within the complaint that would allow one to plausibly infer that the oral promises alleged were somehow made to the parent company rather than the entities Chrysler was actually dealing with, namely Bergstrom Fiat and John Bergstrom himself. For that reason alone, dismissal would be warranted. In addition, the complaint's bare suggestion that Nancy Davis was making promises to Bergstrom *Corporation* is a legal conclusion, not a fact. As such, it is not the sort of "fact" that must be accepted as true at the pleading stage. Instead, the only fact I must assume to be true is that she made a promise to John Bergstrom himself and

17

possibly another company representative. Without any explanation of *why* Chrysler would have been making promises to the parent company, a company with whom it was not establishing any contractual relationship, I cannot reasonably infer that the allegations are plausible. Instead, it appears that the distinction Plaintiffs now make between the parent and the subsidiary is merely an attempt to circumvent very clear contractual language indicating that the Fiat dealership would *not* be an exclusive one.

### 2. Exclusivity is Inconsistent with the Dealership Agreement

A second problem with Plaintiffs' argument is that the dealership agreement is unmistakably clear as to its non-exclusivity, and the dealership agreement, properly understood, is thus wholly inconsistent with Bergstrom Corporation's claim that it believed it had an exclusive right to establish dealerships throughout Wisconsin. The dealership agreement stated that not only was Bergstrom Fiat's "sales locality" non-exclusive, but that Chrysler reserved the right "to establish additional Chrysler Group dealers at any location." (ECF No. 22-6 at ¶ 7.) In addition, Chrysler retained the ability to re-define the sales locality—that is, it could make it larger or smaller. What this means is that John Bergstrom and Bergstrom Fiat agreed to open a non-exclusive dealership whose boundaries were subject to change. And because the dealership agreement between Chrysler and Bergstrom Fiat was non-exclusive even with respect to the Milwaukee territory, that meant that Chrysler would remain free to appoint another dealer right across the street from Bergstrom Fiat if it so desired.

Thus, when John Bergstrom put pen to paper to sign the dealership agreement, he was acknowledging that Chrysler had the right to appoint any dealer it wanted in the rest of the state. Such an arrangement is wholly inconsistent with the idea that *anyone*—much less Bergstrom

Corporation itself—could maintain any kind of exclusive dealership in the state or have a right of first refusal over any future dealerships. By the terms of the very contract John Bergstrom signed on behalf of Bergstrom Fiat, Chrysler retained the right "to establish additional Chrysler Group dealers at any location," which of course includes Madison.

As noted earlier, the Plaintiffs have argued that principles of corporate and contract law mean that Bergstrom Corporation cannot technically be bound to the contract of its subsidiary. Even if that is true, however, principles of common sense dictate that an individual who is the agent for two corporations cannot continue to rely on an oral promise of X once he signs a contract saying Y, regardless of which entity he is representing at the time. The contract John Bergstrom signed indicated quite clearly that Chrysler had the ability to name other dealers at its own discretion, and in fact it could also have named Bergstrom Fiat to be a dealer in Madison as well. As discussed above, this conflicts squarely with any notion that Bergstrom *Corporation* would be able to have an exclusive dealership right elsewhere in the state, since its own subsidiary (if we are indeed treating them separately) would have the right to compete with its parent by the terms of the very contract that the agent for both entities signed. Plaintiffs cannot have it both ways. If the oral promise of exclusivity truly existed, the dealership agreement should have been a major alarm bell indicating that the terms of the deal had changed, not just for Bergstrom Fiat but for Bergstrom Corporation as well. The fact that John Bergstrom signed such an agreement completely undercuts any claim that he was somehow relying on earlier oral promises to the contrary.

To clarify, I am not concluding that Bergstrom Corporation is "bound" by the terms of the dealership agreement; as Plaintiffs duly observe, it is a separate legal entity and it would have been easy enough for Chrysler to have insisted that it become a party as well. Instead, I am concluding

19

that the common agent's act of reading and *signing* that agreement and being apprised of the non-exclusive nature of the Fiat dealership situation in Wisconsin is an act that either precludes reliance on any contradictory oral promises or indicates that such promises were never made in the first place. In the first case, I conclude that when an agent-owner represents more than one principal, even though the agent did not "bind" its non-signatory principal to an agreement, the agent's decision to sign an agreement that wholly undermined an alleged oral understanding with that principal acts as a waiver or forfeiture of any right to pursue such an oral agreement. More concretely, the very terms of the dealership agreement the agent signed on behalf of one principal (Bergstrom Fiat) contradict the agent's alleged understanding of the agreement he had reached on behalf of the other principal (Bergstrom Corporation). In fact, by signing such an agreement, the agent was in some sense inducing Chrysler to breach the very oral agreement he now wants to enforce. That is, the very creation of the Bergstrom Fiat dealership under the terms of the dealership agreement was a violation of Bergstrom Corporation's alleged right of exclusivity because the dealership agreement allowed Chrysler to appoint dealers (including Bergstrom Fiat) anywhere in the state. In short, if Bergstrom Corporation truly had an exclusive agreement with Chrysler, the time for pressing that point was during the negotiations between Bergstrom Fiat and Chrysler.

And even if Bergstrom Corporation is not somehow precluded from enforcing the alleged oral agreement, the *Twombly* and *Iqbal* issues discussed above apply with even stronger force. It is simply not plausible that the CEO of the state's largest car dealership would believe that he had an oral promise that his parent company would have an exclusive right to sell cars in the state at the same time he signed a dealership agreement (while represented by counsel) indicating that the Fiat dealership was *not* exclusive. As noted above, the terms reached with Bergstrom Fiat indicated that

20

Chrysler could appoint dealers wherever it wanted, which undercuts any suggestion that there was some kind of inconsistent side promise to the parent company.[2]

## III. Conclusion

For the reasons given above, the complaint fails to state plausible claims upon which relief may be granted. The motion to dismiss is therefore **GRANTED**. The action is **DISMISSED** with prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this __31st__ day of October, 2012.

_s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

---

[2] For the same reasons, any reliance on such a promise would have been unreasonable after signing the agreement. As such, any promissory estoppel claim based on these allegations fails as well.

21